[No. 3149.]

## NEWTON OWENS *v.* THE STATE.

1. MURDER—EVIDENCE—CONFESSIONS IN CUSTODY.—See the opinion *in extenso* for facts *held* to constitute such custody as to exclude the confession of an unwarned defendant. Note also evidence *held* not admissible under the rule which admits the unwarned confessions of facts by the accused which, being found to be true, conduce to the establishment of his guilt.

2. SAME—CASE APPROVED.—The ruling in *Weller's case, ante,* page 200, to the effect that if, in connection with the confession, a fact confessed was found to be true, and such fact conduced to establish guilt, the main fact, as well as all other facts, whether found true or not, are admissible, is approved. But see the opinion for evidence *held* not to come within the purview of the rule.

---

---

Appeal from the District Court of Houston. Tried below before the Hon. J. R. Kennard.

The indictment charged the appellant with the murder of Mattie Murchison, in Houston county, Texas, on the twentieth day of December, 1883, by stabbing and cutting her with a knife. The conviction was for murder in the second degree, and a term of fifteen years in the penitentiary was the punishment awarded.

The first witness introduced by the State was William Stanton. He testified that he was personally acquainted with the defendant, but had no acquaintance with Mattie Murchison, though he had seen her. He recollected the evening on which she is said to have been killed. He saw the defendant on that evening on the road which leads through his, witness's, field. Defendant was then about three-quarters of a mile from where the killing is said to have occurred, and it was about mid-afternoon. Witness observed no blood on defendant's clothes at that time. He said nothing then to the witness about the deceased. The defendant was then traveling in the direction of his house. The defendant came to witness's house on the night after the day of the killing, after the witness had gone to bed. He told the witness that a little circumstance had happened, and that he wanted to tell witness about it. He then said that he and the deceased were walking along the road together, he on his way to Doze Gossett's, and the deceased on her way to Mrs. Leaverton's, when they met two white men armed with shot guns; that the white men took the woman away from him, and he feared they had killed her. He said that the white men ordered him to abandon the road and take to the woods; that his horse, which he had been leading, ran with him pretty fast through the woods, and finally brought him in collision with a limb, and that the blow made his nose bleed like a beef. The witness had known the defendant since he was quite small, and had always known him as a good boy. This was the first trouble witness had ever known him to be in.

Dick Stanton was the next witness for the State. He testified that he knew the deceased, Mattie Murchison. She was killed a few days before Christmas, 1883, in Houston county, Texas. The witness saw the defendant on the morning of the day Mattie was killed. The witness went to the house of Albert Jones on that morning, and while he was in Albert Jones's field the defendant rode up, saying that he was going down to Lewis Porter's. Wit-

C1

ness told his sister Laura then that he believed he would go down to old man Stanton's. The witness saw the defendant again that same evening in the old field at Mr. Stanton's, and spoke to him at a distance. The defendant said nothing to witness either time on that day about the deceased. The witness next saw the defendant at Albert Jones's house that night at about nine o'clock. The defendant then said that he had been more severely frightened that evening than he had ever before in his life; that two white men, armed with shot guns, ran on to him, searched him, and took the girl Mattie away from him; that one of the men took an old broken pistol from him and demanded his money; that one of them drew a knife, which he opened with his teeth, and told him to take to the woods and not to follow the road; that when they ordered him to leave one of the men put a gun to his face, and, pointing to the woman, said: "We will settle with her."

The witness saw the defendant again next morning, but he said nothing then. On the next (Saturday) night defendant was arrested. Wes. Owens, the defendant's brother, said nothing to witness about a handkerchief. While at the house of Albert Jones, the defendant, his brother Wes. and the witness went behind the house, and defendant said "if I was with the officers and others who tracked him, and I saw his handkerchief near a big hole of water, to get it and put it in my pocket and say nothing about it." He also told Wes. Owens to "get that knife and clean it."

Next morning, while still at Albert Jones's, defendant asked witness to swear that when witness overtook him in the old field he, defendant, then told him, witness, about Mattie Murchison. When the defendant met the witness on Friday morning near Albert Jones's, he asked witness to go with him to Porter's. Witness declined, saying the people around there had no good blood for him. The witness had been indicted for the theft of some hogs in that neighberhood, and that was why witness said that the people in that neighborhood had no good blood for him. It was about eight or nine o'clock in the morning when the defendant spoke to the witness about the handkerchief. Officers Ellis and Smith had not then arrived. Witness did not know whether they went to Albert Jones's at all. No one but Wes. Owens, the defendant's brother, was present when the defendant made the request of witness concerning the handkerchief. It was then two or three years since the witness and the defendant

had a difficulty about a woman. That woman was now the witness's wife. Witness did not know why the defendant asked him to look for his handkerchief, and told Wes. in his presence to clean his knife. No one was present when the defendant asked witness to swear for him. That request was made on Saturday, but the witness did not remember where it was made. Witness had talked to his wife but not to his mother about the killing. Witness had nothing whatever to do with the killing of Mattie Murchison. When the witness first met the defendant at Albert Jones's it was about ten or eleven o'clock. He was then going in the direction of Billy Lewis's house, but said that he was going to Ike Porter's. Defendant then asked witness for tobacco. Witness asked him for a knife to cut it with, and he said that he had none. Witness said that he was mistaken in saying that the statement about the handkerchief was made on Saturday. It was made on Sunday. Albert Jones and George Owens were at the house.

The witness said nothing about the defendant's request about the handkerchief and knife before the jury of inquest, because he was not asked about it. Within an hour after the defendant made his request about the handkerchief and the knife, the witness saw Mr. Hill and Mr. Smith, the officers. He told the officers nothing about the handkerchief and knife matters, because he was afraid that he would be called as a witness. He knew that the officers were then in search of evidence. The witness believed that the body was found by Albert Jones, a white boy, and the defendant about noon on Saturday. The body lay about two hundred yards from the road. The deceased, when found, was lying on her back. The ground was not broken, but the leaves were " rustled up " about the body. The witness saw blood leading from the body to the road. He saw no horse tracks near the body, and no evidence of a horse having been hitched near the road. The difficulty the witness and defendant had about a woman arose over a handkerchief. When the defendant, on Sunday, made the requests about the handkerchief and knife, the witness stepped into the house and told his wife and sister Laura. Next day he told Joe Brown Stanton about it. Old man George Owens, Wes. Owens and the defendant were in the yard when witness told his wife and Laura about the handkerchief and knife requests. The witness saw no cut place on the body of the deceased, a sack having been drawn over the wound. Witness did not say on the exam-

ining trial that the first persons he told about the handkerchief and knife requests were Mr. Hill and Mr. Bayne, after he came to the town of Crockett. The body was found late on Saturday evening.

Henry Bean testified, for the State, that he remembered the day that Mattie Murchison was killed. Witness saw the defendant that night at his father's house. He had some blood drops on his breast, and marks like finger prints could be traced on his breast. His right shirt sleeve was stained with blood. Albert Jones was present. When the defendant came in and sat down, the witness asked him what he had done to his nose to make it bleed so. He replied that he had been more thoroughly frightened that evening than he had ever before been in his life; that while he and Mattie Murchison were walking along the road together, he going to Gossett's, and Mattie to Mrs. Leaverton's, two white men, armed with shot guns, halted him and asked him if he had any money; that he told them he had not; that one of them then took from his, defendant's, pocket, an old pistol that would not shoot; that the white men put their guns in his face when they demanded his money; that one of them then opened a knife with his teeth and said: " G—d d—n you, take to the woods; leave here, and don't you go back the road you come"; that they then pointed to Mattie and said: " D—n you, you come with us; we will take care of you"; that the deceased began crying, and he got on the horse he had been leading up to this time; that in his flight through the woods he struck the limb of a tree with his nose and it bled a great deal.

Albert Jones, witness and defendant, after defendant changed his coat and shirt, started to Albert Jones's house, going by Porter's house at the request of defendant, who said that Porter had told him that he, Porter, was going to Mrs. Leaverton's that night, and he wanted to ascertain whether or not deceased had ever reached Mrs. Leaverton's. The party named went on toward where the body of the deceased was afterward found, and defendant showed a place where he said the white men took the girl away from him. He, defendant, at that time, said that he heard the girl scream two or three times after the men took her off, and that he was afraid the men had killed her. Defendant repeated the story when the parties reached Albert Jones's house. All the parties present at first made light of the affair, but the defendant finally prevailed upon all to believe him. The party then went to Mr. William Stanton's, to whom,

after he got out of bed, the defendant repeated the story. Witness afterward saw the defendant in the day time. He did not then notice any bruises about his nose. While at Albert Jones's house, the defendant asked for turpentine, and bathed his nose. When he came up to his father's that evening, he was riding swiftly. It was about one hour before sundown that defendant reached his father's house. The witness had not seen the defendant before on that day.

Cross-examined, the witness stated that when the defendant rode up to his father's house on the evening in question, there were present the witness, Albert Jones and the defendant's father and mother. Witness saw no other blood than that stated on the defendant's person. The witness saw the body of the deceased on Saturday evening. There were at least five houses within the radius of a half a mile from the place where the body was found. Mrs. Leaverton lived within about a mile from that point. The road was wooded on either side, denser on the side opposite that on which the body was found. The witness had no recollection of seeing the defendant wash his nose when he got home. The blood on his breast looked as though it had dropped from his nose. At the time that the deceased was killed, the witness lived at the house of Jake Stanton. The party named went to the various places that night for the purpose of discovering the fate of Mattie Murchison. The defendant related his narrative at every place they stopped. The party did not go to Mrs. Leaverton's. Witness saw no blood on the mane of the defendant's horse.

Frank Hill testified, for the State, that at the time of the homicide he was justice of the peace of precinct number one, Houston county, Texas. On Saturday morning the defendant came to the witness's office and related about the same story concerning the deceased, himself and two white men that he told the other witnesses. Witness told the defendant to go back and search for the girl; that he did not think he would find that she had been killed by the men. Next morning the defendant and Dick Stanton came to the witness's office and said that they had found the woman's body. Defendant said that he thought they had shot her through the side and cut her throat. Defendant said that he first told Dick Stanton of the encounter with the white men, and that they took the woman away from him about sundown.

Witness ordered a wagon to go to the body, and went there

himself with the defendant and others. Witness asked the defendant if he had changed his coat and shirt. He first said that he had not, and then admitted that he had. He said that his clothes were at home to be washed, but that there was nothing on them. Witness went that night to defendant's father's house to see the clothes. The jeans coat and the white shirt were wet when witness saw them that (Saturday) night, about one o'clock. Witness did not, of his own knowledge, know that the clothes shown him were the ones that the defendant wore on the day that the killing occurred. At the point in the road where the defendant said that the woman was taken from him, the witness saw tracks, but he saw no tracks leading from the road to the point where the dead body was found. The body lay north, and a horse track led off in the opposite direction. The horse track was trailed to a small branch, where a shoe track corresponding with that in the road was found. A pair of fine boots was found at the house of the defendant's father, which corresponded with the tracks. Two hundred yards further on the witness and party came to another branch that had water in it, and found where a horse had been tied to a bush, and had walked around it. At this place they found a handkerchief in a pool of water, and foot prints at the edge of the water. The way the tracks went led up to Stanton's place.

The body of the deceased lay on the left side, with the head (hand?) on the chin. No wounds were discovered until the clothes were removed. The defendant described the two men minutely. One, he said, was a taller man than the other; one wore a black and the other a white hat, and one of them had on speckled pants. Witness saw a few drops of blood about twenty feet from the body. The leaves were stirred up between the body and the road. The hat of the deceased was found beyond the body. Mrs. Leaverton lived a half or three quarters of a mile distant from where the body was found. The clothes of the deceased were not torn. The deceased was about twenty years old, was over medium size, and would weigh about as much as the defendant. The witness saw spots on the handkerchief, but could not say they were blood spots. When the defendant first came to see witness he seemed positive that the woman was dead and that the men had killed her. Defendant admitted that, some eight or ten years before her death, he was criminally intimate with the deceased. Defendant appeared

anxious to help find the murderer, and pointed out the course he followed with the woman. Witness found no pistol himself.

Albert Jones testified that he was at the house of the defendant's father on the day of the killing, when the defendant came home. As to what transpired that night, the witness testified substantially as did the witness Henry Bean, and in addition that, according to his recollection, the defendant washed his nose when he came to the house. Witness saw no blood on defendant's face or nose. At witness's house the defendant asked witness's wife for turpentine to bathe his nose.

Deputy Sheriff Ellis was the next witness for the State. He testified as did Hill concerning the finding of the body, the hat, the horse track, the boot track, the handkerchief, etc., and the conduct of the defendant on that occasion.

Doctor J. B. Smith testified, for the State, that he asked the defendant to describe the two white men who took the woman. Defendant said they were good looking men, well dressed, wore colored felt hats and about number six boots.

Frank Hill, recalled for the State, testified that defendant said that one of the men was about a hundred yards distant from him. The deceased had the appearance of being pregnant. The defense admitted that the wounds on deceased were mortal, and the State rested.

Lewis Porter was the first witness for the defense. He testified that he had known the defendant and the deceased all his life. Defendant and deceased were always friendly. Witness knew that the pistol the defendant owned at the time of the killing would not shoot. Both the defendant and the deceased were at the witness's house on Friday, the day of the killing. Deceased left witness's house about twelve o'clock, saying that she was going to Mrs. Leaverton's, to do which she would have to go by Billy Lewis's. When dinner was announced, the defendant left to go by Billy Lewis's to his father's. The defendant was horseback. The witness was present at the finding of the body of the deceased, and saw that her throat was cut. When defendant left the body, he said that he was going to make it known. Witness had some hogs marked at his house that day, the knife used in the work belonging to Henry Johnson. If the defendant had a knife at the witness's house witness did not know it. The face of the deceased, when found, was not covered with her sack. Witness stooped over but did not touch the body. Defendant left his horse at Albert Jones's, and walked with the

party to hunt for the body. When he left the witness's house that day, the defendant took his broken pistol with him.

Billy Lewis testified, for the defense, that the defendant and the deceased were both at his house on the day of the killing. The deceased came first. When the defendant came he did not get down from his horse until the deceased asked him for a dip of snuff. The two remained about an hour, and started off together about two or three o'clock, the defendant leading his horse. Deceased said that she was going to Mrs. Leaverton's. The body of the deceased was afterwards found about a mile from the witness's house. Witness had never known any hard feeling between deceased and defendant. While at witness's house they hugged and kissed each other very affectionately. Henry Johnson came to witness's house just after the defendant and deceased left, and went on in the same direction they had gone. The witness never afterwards saw deceased alive. He saw the defendant again that evening going to Ike Porter's. Witness did not know whether or not Henry Johnson lived in the direction the parties all went when they left witness's house. Martin Van Buren's house was between witness's house and the place where the body was found.

Mrs. Meissell testified, for the defense, that she was teaching school in the neighborhood at the time of the killing. On her way to school on the day of the killing, between seven and eight o'clock, the witness saw two white men near the road. They were each armed with a shot gun. Witness noticed that each had his coat collar turned up and hat pulled down. She saw that they were looking at her, and she increased her speed. Each man had his pants in his boot legs. They were going in the direction of Mrs. Leaverton's house. These men said nothing to the witness. These men had on dark clothes. One wore a dark and one a white hat. Both men were large, but one taller than the other. They wore brown top boots. Witness had never seen either of these men since. They crossed the road ahead of witness, and walked right through a salt lick that was near. Witness offered on the Sunday before this trial to go and show Mr. Hill where these men crossed the road and salt lick, but he said that he had no time to go. The witness saw these men and was frightened by them, about two and a half miles from her school house.

The witness and her husband were at home on Saturday morning when the defendant rode up on his way to Crockett. He

asked if witness or her husband had seen two white men. Defendant described the men exactly as the witness saw them, and related his adventures with them as he had to previous witnesses. He said that he heard no report of firearms after they took the woman, and that he was afraid they had cut her throat.

Witness then remarked that the men he described must have been the men she saw.

Wesley Owens, the defendant's brother, was his next witness. He testified that he was present at Albert Jones's house on the occasion referred to by Dick Stanton, and he denied positively the conversations about the handkerchief and knife related by Stanton. He had no conversation behind Jones's house, and heard none as stated by Stanton. Witness saw the defendant at home on Friday evening, and noticed a few drops of blood on his saddle horn. The witness picked up the defendant's broken pistol some twenty steps from the point where the deceased lay. If defendant owned a knife on the day of the killing the witness did not know it. Witness said nothing about finding the pistol and the blood on the saddle. He did not remember that Lewis Porter looked at the face of the deceased.

Minerva testified, for the defendant, that she was the mother of the deceased. She knew that the deceased was not pregnant when killed, from the fact that she miscarried about two weeks before her death.

Charlie Porter testified, for the defense, that he saw the defendant and the deceased together on the day of the killing. They were perfectly and noticeably friendly.

A. W. Ellis, for the State, in rebuttal, testified that he heard the testimony of Mrs. Meissell. Witness examined the salt lick for tracks, but discovered only horse and hog tracks. He found no human tracks at all. There was a very slight rain on Sunday morning, but not enough to obliterate tracks. Messrs. Hill and Smith made the examination of the salt lick with the witness. Witness did not dismount from his horse to look for tracks. The party arrested the defendant about daybreak on Sunday morning. They turned him over to his father, who was to deliver him at Martin Van Buren's house, which he did about sunrise.

Frank Hill, recalled by the State, in rebuttal. corroborated this last testimony of Ellis.

The motion for new trial was based upon the questions discussed in the opinion.

*Cooper & Cooper*, for the appellant.

*J. H. Burts*, Assistant Attorney General, for the State.

Hurt, Judge. At the spring term of the district court of Houston county appellant was tried and convicted for the murder of Mattie Murchison; the jury finding him guilty of murder of the second degree, and assessing his punishment at fifteen years confinement in the penitentiary.

From this conviction he appeals to this court, and assigns numerous errors for a reversal of the judgment. We deem it necessary to notice and consider but two of the errors assigned. 1. That which relates to admissions of statements made by the defendant, he claiming that he made them while under arrest. 2. The sufficiency of the evidence to support the verdict.

To the first error assigned: It appears from the record that A. W. Ellis was deputy sheriff. Relating to the arrest of defendant, he says: "We had defendant arrested, and about daybreak Sunday morning we turned him over to his father, George Owens, and he was to deliver him to us at Martin Van Buren's by the time we reached there, which he did about a half hour of sun." Now, while the defendant was in the custody of his father, before he was turned over to the deputy sheriff, Ellis, the witness Dick Stanton swears that "defendant, Wes. Owens and myself went behind the house, and defendant told me that if I was with the officers and others tracked him, and I saw his handkerchief near by a hole of water, to get it and put it in my pocket and say nothing about it. Defendant said to Wes. Owens to get that knife and clean it." These statements were introduced in evidence by the State over the objections of defendant, the objection being that when made he was under arrest.

This objection, it is insisted, is met by the State with these matters: 1. That defendant was not under arrest. 2. If he was, that the handkerchief was found in pursuance of the confession, and that therefore this matter was admissible under that part of Article 750, Code of Criminal Procedure, which provides that the confession may be used "when, in connection with such confession, he makes statement of facts or of circumstances that are found to be true, which conduce to establish his guilt," etc.

We are of the opinion that defendant was in confinement, and that to authorize his confessions to be used against him, he must

have been cautioned that they could be used against him. This, it is conceded, was not done.

Did he make statement of fact or facts, or circumstances which conduced to establish his guilt? Let us concede that the handkerchief was found just where defendant said it could be found, did this fact conduce to establish his guilt? We think not under the circumstances relating to the handkerchief. Defendant had given minutely the route traveled by him after he left the two men with whom (he says) he left the deceased, Mattie Murchison. How, then, the fact that on this route his handkerchief was found where he said it could be found conduce to establish his guilt, we can not conceive. There was no blood on the handkerchief; at least the testimony fails to show that there was. That it was stained may be true, but certainly the evidence should show the character of this stain. Was it red, green or blue? Or what was its color? We cannot presume that it was stained with blood, nor can we presume that any fact conduces to establish guilt; this must be proven, and clearly proven in order to be made the basis for the introduction of other confessed facts which tend to criminate the defendant.

There being no fact found to be true which conduces to establish defendant's guilt, these statements or confessions were not admissible.

But it may be urged by the State that this statement, or confession, was harmless, as much so as the horse tracks found on his route in pursuance of his history of this matter. If his confession simply stopped with merely finding the handkerchief where he said it could be found, this would be so, but this is not the case. He desired Stanton to pocket the handkerchief and say nothing about it. In this we find very strong evidence of guilt—a desire to conceal that which he believed evidence of his guilt. And while it may be true that there was nothing in the fact that the handkerchief was left at the pool of water on his route conducing to establish his guilt, still defendant believed there was, and was solicitous that this evidence of his guilt (as he supposed) be concealed.

In addition to that which relates to the handkerchief, the State proved by Stanton that while defendant was in confinement, he requested his brother " to get that knife and clean it." Viewed in the light of the fact that deceased was killed with a knife, the request of defendant of his brother was evidence of a very strong and conclusive nature indeed. Its effect was equal

almost to a direct confession of guilt.    Mattie Murchison had been brutally murdered.    Her murderer—the guilty demon—had cut her throat.    Defendant was suspected of this most foul deed. Thus circumstanced, he says to his brother, " get that knife and clean it.".  As above said, the effect of this request was a terrible confession, and was, without any sort of doubt, calculated to, and indeed did, have very great weight with the jury.    The knife was not found, nor attempted to be found, with or without blood on it, in pursuance of this statement or request, and hence its introduction in evidence was clearly erroneous.

We are not to be understood to be holding that it was necessary to find a bloody knife in pursuance of the statement, in order to the admissibility of this matter in evidence.    For this court this term decided (*Weller* v. *The State, ante,* p. 200) that where, in connection with the confession, a fact is confessed and found to be true, and such fact conduces to establish guilt, the main fact as well as all other facts are admissible, whether found to be true or not.    The fatal objection to the admission of the statements of the defendant in this case consists in the fact that no fact confessed by him was found to be true which conduces to establish his guilt.    That is, the fact found to be true was under the circumstances of this case not inculpatory.    This being the case, he not first being cautioned, and being in confinement or under arrest, his statements, or confessions, are not evidence against him.

Does the evidence support the verdict?    As we do not desire to prejudice the rights of the defendant we will not discuss the evidence, but must say that, were there no other reason for reversing this judgment, we could not do so for the reason that the verdict is not supported by the evidence.    The objection to the charge of the court, reference being had to the facts in this case, is not well taken.

For the error of the court relating to the admission in evidence of the confessions of the defendant, the judgment is reversed and the cause remanded,

*Reversed and remanded.*

Opinion delivered June 18, 1884.